UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

James E. Pietrangelo, II,       :
            Plaintiff,          :
                                :
            v.                  :       File No. 1:09-CV-68
                                :
Alvas Corporation, George       :
Alvanos, Christine Alvanos      :
Evan Alvanos, John Doe,         :
City of Burlington,             :
Emmet Helrich, Wade Labrecque,:
William Sorrell,                :
            Defendants.         :

OPINION AND ORDER
(Papers 6, 7, 24, 27, 34, 41, 42, 43, 52, 68, 73, 76 and 87)

        The facts of this case began with the plaintiff's purchase
of a hot dog at a deli in Burlington, Vermont.  Plaintiff James
Pietrangelo, an attorney proceeding *pro se*, was not satisfied
with how the hot dog was prepared.  He shared his concern with
the deli's management, the Health Department, and after deciding
to picket outside the deli, the Burlington Police Department.

        While picketing, Pietrangelo was allegedly confronted in a
hostile and aggressive manner by an unknown defendant ("John
Doe").  According to the complaint, the police responded to the
scene, allowed John Doe to depart, and notified Pietrangelo that
he was not to picket on private property.  Days later,
Pietrangelo commenced this lawsuit in state court alleging
conspiracy, tort violations, and violations of his state and
federal constitutional rights.  The case was subsequently removed
to this Court.

Pending before the Court are a series of motions, including Pietrangelo's state court motion for a temporary restraining order, his motion to remand, and cross-motions for summary judgment.

## Factual Background

The complaint alleges that on July 25, 2008 at approximately 3:45 p.m., Pietrangelo ordered a hot dog at the Pine Street Deli in Burlington, Vermont. The employee who prepared the order allegedly "handled the food in an unsanitary manner. Dismayed and disgusted, Plaintiff paid for the hot dog -- obtaining a receipt -- and left without receiving his food." (Paper 5 at 4).

Pietrangelo immediately called the Health Department to report the incident, and was allegedly informed that the handling of the hot dog did, in fact, constitute a health violation. He then returned to the deli to inform the owner "so that the owner could take corrective action himself immediately." Id. The owner was not available, but Pietrangelo was able to speak to the owner's son, defendant Evan Alvanos. In the course of the conversation, Alvanos was allegedly rude to the plaintiff, telling him to "shove the health regulations up his ass" and accusing him of failing to pay for the hot dog. Id. at 5. Pietrangelo informed the Health Department of Alvanos's response, and was told that a health inspection would be scheduled.

After speaking with the Health Department, Pietrangelo determined that he must, "for the public's sake . . . picket Pine Street Deli to warn the public about the unsanitary food handling and to prompt Pine Street Deli to respect Health regulations." Id. Before doing so, he called the Burlington Police Department and informed the police of his plan. He also informed the police of his conversation with Evan Alvanos.

At approximately 5:30 p.m. that same day, Pietrangelo returned to the public sidewalk in front of the deli, armed with a sign and a video camera. According to the complaint, the sign "mentioned the unsanitary food handling and Evan's response when confronted by Plaintiff." Id. at 6. The purpose of the video camera was "to document the picketing." Id. at 5.

Around the time that Pietrangelo began his picketing, a Burlington Police car arrived and parked in the deli parking lot. The officer in the car, later identified as defendant Wade Labrecque, did not speak with Pietrangelo initially, but did speak with Evan and Christine Alvanos. Deli owner George Alvanos subsequently arrived at the scene, and Officer Labrecque spoke with him as well. Labrecque did "eventually" approach Pietrangelo and "merely told Plaintiff that he could not come onto Pine Street Deli property while picketing." Id. Pietrangelo responded that he would only be picketing on public property.

The complaint claims that before Officer Labrecque's departure, Evan Alvanos made "an obvious veiled-threat to Plaintiff," telling him "to the effect: 'Best you leave.'" Id. at 7. Pietrangelo complained to Officer Labrecque about the threat, but Labrecque allegedly took no action before leaving the scene. The parties dispute whether Labrecque himself overheard Alvanos's comment.

At approximately 6:30 p.m., defendant John Doe approached Pietrangelo in an aggressive manner from the direction of the deli. The complaint describes Doe as a male with a "hardened, muscular look to his body and a hardened, violent look on his face." Id. at 8. Doe allegedly proceeded to stand close to the plaintiff, touching him on at least three occasions, and yelled at him in a violent manner. When Pietrangelo tried to move away, Doe repositioned himself so as to impede Pietrangelo's progress. When Pietrangelo complained to Doe that his movement was being impeded, Doe told him that he was "free to leave the area entirely." Id. at 9.

Pietrangelo called 911 and informed the dispatcher that he was being "accosted." Id. The dispatcher advised him to walk away, but Pietrangelo insisted that he could not because Doe was blocking his movements. Although Pietrangelo claims that the police response to his call was delayed, Burlington Police Lieutenant Emmett Helrich subsequently arrived at the scene.

The complaint alleges that Lieutenant Helrich spoke with John Doe and instructed him to leave, but failed to obtain his name or question him about his conduct. Helrich also spoke with the Alvanoses and Pietrangelo. When speaking with Pietrangelo, Helrich allegedly required him to "stand in place on a small strip of curb lawn along Pine Street and answer his questions, which Plaintiff did." Id. at 10. Pietrangelo claims in his complaint that he "did not consent to this order and requirement but complied with it because he felt he had no choice otherwise." Id.

Helrich allegedly asked Pietrangelo about his reason for picketing and issued him a "no trespass" order warning him not to step onto deli property.[1] Helrich also allegedly ordered Pietrangelo to limit his picketing to a strip of curbside lawn. Helrich and Officer Labrecque, who had returned to the scene, then drove away.

At summary judgment, Lieutenant Helrich has provided an affidavit in which he explains his actions. According to Helrich, his first conversation when he arrived at the scene was

---

[1] Defendant William Sorrell, Vermont's Attorney General, submits that under 13 V.S.A. § 3705 a no trespass order is merely a form of notice of property rights, and does not signify any sort of civil or criminal violation. (Paper 21 at 2). The City Defendants have offered testimony to support this assertion, adding that the notice is "a confidential document within the police department, and is not generally available to the public." (Paper 88-4 at 6).

with John Doe.  "I told John Doe Plaintiff had every right to protest on public property . . . .  I also told John Doe Plaintiff likely sought attention through his protesting, and that if he didn't like his message, the best course was to ignore him.  John Doe seemed rational, agreed with me, and left the area."  (Paper 88-4 at 2).

Helrich next spoke with the deli owners.  "I essentially gave them the same advice . . . .  The owners seemed rational and agreed Plaintiff had a right to be there, and I believe they accepted and agreed with my advice.  I did not believe the owners – or any other known individual – planned to harm Plaintiff for protesting."  Id.

Helrich then approached Pietrangelo, "who would not identify himsef, and began berating me.  Of all the individuals I spoke to, Plaintiff seemed to be the least rational."  Id.  Helrich acknowledged Pietrangelo's right to picket, but advised him that he could not obstruct pedestrian traffic on the sidewalk or interfere with access to the store.  Although he does not recall the exact words he used, he remembers suggesting that Pietrangelo protest from the grassy "greenbelt" next to the sidewalk.  Id. at 4.  "I do not believe I told Plaintiff to stay off the sidewalk, but rather, said he could not obstruct others on the sidewalk while protesting."  Id.  Helrich also informed Pietrangelo that

the deli owners did not want him on their property, and issued the notice against trespass before leaving the scene.

Pietrangelo subsequently called the Burlington Police Department and asked to speak with Helrich's superior. The dispatcher allegedly informed him that all superiors had left for the day, and that he could lodge his complaint with the FBI. Pietrangelo decided to walk to the police station to obtain the name of the officers involved, and to then go home. He claims that after leaving the police station, he was harassed by a group of young males.

Pietrangelo asserts in his complaint that he had planned to continue his picketing "for an indefinite period." However, because of the actions allegedly taken by the defendants, he decided not to return. (Paper 5 at 14).

The complaint sets forth nineteen causes of action, ranging from assault and battery to false imprisonment and conspiracy. Pietrangelo also claims that the defendants denied him a host of constitutional rights. For relief, he is seeking damages, an injunction barring the City of Burlington from preventing his picketing, and an order "requiring Defendant City of Burlington to have a police officer present on public property at Pine Street Deli at all times while Plaintiff is picketing . . . ." (Paper 5 at 24). Pietrangelo's current mailing address is in Cleveland, Ohio.

## Procedural Background

Pietrangelo filed his complaint in state court on July 31, 2008, less than one week after the incident in question. He also moved for a preliminary injunction and a temporary restraining order. A hearing on these motions was held in state court on August 26, 2008, but no order was issued.

Over the next several months, the parties filed various dispositive and non-dispositive motions. On March 16, 2009, defendants City of Burlington, Helrich and Labrecque filed a notice of removal, and the other defendants subsequently consented. Among the pending motions are Pietrangelo's motion for remand, his initial preliminary injunction motions, and cross-motions for summary judgment.

## Discussion

### I. Motion For Remand

Because a remand to state court would impact which court rules upon all of the other pending motions, the Court will address Pietrangelo's motion to remand first.

Pietrangelo argues that removal in this case was defective in several respects. His first argument is that the notice of removal and consents thereto were untimely. Specifically, Pietrangelo contends that the 30-day removal period started when the first defendant received service, and that the notice of removal was filed well beyond that time. As to the consents, he

claims that even if the Court does not accept the "first-served rule," the consents to removal filed by the co-defendants were untimely.

A.   Timeliness Of Notice Of Removal

The parties agree that defendant Sorrell waived service on August 21, 2008.  The remaining defendants, however, were not served until February 24 and 25, 2009.  Pietrangelo argues that the 30-day removal period under 28 U.S.C. § 1446(b) commenced when service on defendant Sorrell was effective.  He also submits that the defendants were provided copies of the complaint months before they were formally served.  In response, the defendants argue that the appropriate rule is for the 30 days to commence when proper service, and only proper service, is made upon either the last defendant served or the removing defendant.

In Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 347 (1999), the Supreme Court stated that for removal purposes, a defendant is "not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process."  Accordingly, service of process, and not mere receipt of the complaint, is a prerequisite to a defendant's obligation to engage in litigation, and the removal period does not begin until there has been receipt of a properly served summons.  Murphy Bros., 526 U.S. at 352-53 ("Nothing in the legislative history [of § 1446(b)] . . . so much as hints

that Congress . . . intended to dispense with the historic function of service of process as the official trigger for responsive action by an individual or entity named defendant.").

Murphy Bros. did not address the issue of multiple defendants with varying service dates.  Nor has the Second Circuit determined when the 30-day removal period commences in a case with multiple defendants.  "However, following the Supreme Court's decision in Murphy Bros., district courts in this Circuit have generally applied the last-served defendant rule, in which defendants have thirty days from the date that the last defendant is served to file a notice of removal."  Barnhart v. Fed. Dep't Stores, Inc., 2005 WL 549712, at *6 (S.D.N.Y. Mar. 8, 2005) (citing Fernandez v. Hale Trailer Brake & Wheel, 332 F. Supp. 2d 621, 622-24 (S.D.N.Y. 2004) (finding last-served defendant rule to be "the more sound approach" and noting that "most district courts in this circuit have adopted the last-served defendant rule")); Piacente v. State Univ. of New York at Buffalo, 2004 WL 816885, at *2-3 (W.D.N.Y. Feb. 14, 2004); Varela v. Flintlock Constr., Inc., 148 F. Supp. 2d 297, 300 (S.D.N.Y. 2001); but see Quinones v. Minority Bus Lines Corp., 1999 WL 225540 (S.D.N.Y. Apr. 19, 1999).

This Court adopts the reasoning in these decisions, and finds in this case that the last-served defendant rule is more consistent with Murphy Bros..  "Unlike the first-served defendant

rule, it provides every defendant with a uniform time in which to seek removal and ensures that no defendant is required to take any action in the litigation before that defendant has been served with the summons." Barhnart, 2005 WL 549712, at *6 (citing Varela, 148 F. Supp. 2d at 300). Indeed, to apply the first-served defendant rule in this case would mean that the right of removal expired long before many of the defendants were served. "Contrary to the ruling in Murphy Bros., this would allow the procedural rights of [those defendants] to 'slip away . . . before one is subject to any court's authority.'" Barnhart, 2005 WL 549712, at *6 (quoting Murphy Bros., 526 U.S. at 356).

As to Pietrangelo's contention that the 30-day period commenced when the defendants received copies of his initial filings, this argument is inconsistent with the Murphy Bros. holding that the clock only commences with "formal process." It is true that there was a flurry of activity at the outset of the case. This activity was brought about, in large part, because of Pietrangelo's requests for immediate injunctive relief. The defendants were forced to respond and defend themselves, and did nothing to waive their rights to proper service. Accordingly, the removal clock did not commence when they received these initial papers. See Heafitz v. Interfirst Bank of Dallas, 711 F. Supp. 92, 96-97 (S.D.N.Y. 1989) (differentiating, for purposes of removal statute, cases in which defendants took merely defensive

actions from those in which they affirmatively asked for a
decision on the merits) (citations omitted).

   B.   Timeliness Of Consents To Removal

     The next question is whether the consents filed after the
notice of removal were timely.  Defendants City of Burlington,
Helrich and Labrecque ("City Defendants") filed their notice of
removal on March 16, 2009.  Service on these defendants was
executed on February 24 and 25, 2009.  Accordingly, the notice of
removal was filed within the 30-day removal period, which expired
on March 27, 2009.

     It is undisputed that, according to the Court's docket, the
co-defendants' consent filings were not accepted by the Clerk's
Office until after the 30-day period had expired.  Specifically,
consent to removal was received from defendants Alvas Corp.,
George Alvanos, Christine Alvanos and Evan Alvanos ("Alvas
Defendants") on April 1, 2009, and defendant Sorrell's formal
consent was received on April 3, 2009.  However, these were not
the first efforts by the defendants to notify the Court of their
consent.

     In the March 16, 2009 notice of removal, counsel for the
City Defendants represented that the co-defendants had consented
to removal, and that they would each formally notify the Court of
their consent.  On March 17, 2009, counsel for the Alvas
Defendants wrote to the Clerk of Court and confirmed his clients'

consent.  (Paper 80-3).  On March 24, 2009, the Attorney

General's office also sent a letter to the Court confirming

consent on behalf of defendant Sorrell.  (Paper 80-4).  These

letters were each returned by the Clerk's Office for failure to

comply with the format requirements of Local Rule 5.1.  (Paper

80-5).  Accordingly, the consents were re-drafted and re-

submitted to the Court.  By the time they were re-submitted,

however, they were no longer within the 30-day window.

"Although there is no statutory requirement that all

defendants either must join the petition for removal or consent

to removal, courts have consistently interpreted 28 U.S.C. § 1446

as requiring that all defendants consent to removal within the

statutory thirty-day period, a requirement known as the 'rule of

unanimity.'"  Beatie & Osborn LLP v. Patriot Sci. Corp., 431 F.

Supp. 2d 367, 383 (S.D.N.Y. 2006).  The question presented here

is whether the defendants' initial efforts to inform the Court,

filed within the 30-day period, were sufficient.

It is clear from the case law that all defendants must

independently express their consent to removal.  See Codapro

Corp. v. Wilson, 997 F. Supp. 322, 325 (E.D.N.Y. 1998) (citations

omitted).  For example, in Bailey v. Boston Scientific Corp, 2007

WL 4180798, at *3-*4 (E.D.N.Y. Nov. 20, 2007), a defendant filed

a notice of removal and stated that the other defendants had

consented.  The consenting defendants did not sign the notice of

removal, did not attach affidavits to the notice, and filed notices of appearance after the 30-day deadline had expired that did not indicate "unambiguous consent to removal" Bailey, 2007 WL 4180798, at *4. Under these facts, the court held that the defendants' efforts to "demonstrate compliance with the rule of unanimity fail." Id.; see also Chabowski v. Caterpillar, Inc., 2007 WL 2493088, at *1 (W.D.N.Y. Aug. 28, 2007) (noting that defendant Caterpillar had not itself "filed anything manifesting its consent to remove."); Ricciardi v. Kone, Inc., 215 F.R.D. 455, 458 (E.D.N.Y. 2003) ("The rule of unanimity requires that all named defendants file with [the] court some form of unambiguous written evidence of consent to removal.").

If the defendants in Bailey had at least notified the courts of their consent, even if those notifications were untimely, the result might have been different. See, e.g., Gay v. Carlson, 1990 WL 20172, at *2 (S.D.N.Y. Feb. 23, 1990) (holding that removal was proper where removing defendant notified the court of unanimous consent in the notice of removal, and supplemental consents were filed outside the 30-day deadline). In any event, the defendants in this case *did* each notify the Court of their consent to removal, though in a format that the Clerk's Office was unable to docket under the Local Rule. Moreover, the initial notifications were timely. Only when required to re-draft their

consents did the defendants find themselves outside of the 30-day period.

Although the Court generally requires full compliance with its Local Rules, the Court may also excuse non-compliance where "strict application of the local rules would lead to an unjust result."  Phoenix Global Ventures, LLC v. Phoenix Assocs., 422 F.3d 72, 75 (2d Cir. 2005).  In this case, the consenting defendants notified the Court of their consents in a timely manner.  Doing so by letter did not strictly comply with this Court's rule for filings, but has been recognized as acceptable in other jurisdictions.  See, e.g., Michaels v. New Jersey, 955 F. Supp. 315, 321 (D.N.J. 1996) (consent may take the form of "filing [defendant's] own notice of removal, an affidavit of joinder or consent, or even a letter provid[ing] the court with a written entry that would unequivocally bind the allegedly consenting defendants"); Ogletree v. Barnes, 851 F. Supp. 184, 190 (E.D. Pa. 1994); cf. Bailey, 2007 WL 4180798, at *4 (noting that Notices of Appearance were not accompanied by "a letter or affidavit indicating unambiguous consent to removal").  Furthermore, the consenting defendants submitted corrected filings in a prompt, though ultimately untimely, manner.  To deny their consents based solely on a formatting requirement, and thus refuse them their statutory right to removal in federal court, would raise form over substance and lead to an "unjust result."

Phoenix Global Ventures, LLC, 422 F.3d at 75.  The Court therefore finds that the consents were timely, and DENIES Pietrangelo's motion to remand the case to state court.[2]

## II.  City Defendants' Motion For Summary Judgment

The defendants were entitled to remove this case to federal court because the Court has subject matter jurisdiction over Pietrangelo's § 1983 claims.  The heart of those claims is that the City Defendants, both on their own and in a conspiracy with the Alvas Defendants and John Doe, violated Pietrangelo's constitutional rights.  Pietrangelo has moved for partial summary judgment against the City Defendants (Papers 42 and 43), and they

---

[2]  Pietrangelo's remaining arguments for remand are without merit.  One such argument is that defendant William Sorrell failed to file his consent to removal.  In fact, the consent was docketed on the same day as Pietrangelo's motion to remand. (Paper 74).  Pietrangelo also contends that the removal was technically flawed because his state court notices of lawsuit and requests for waiver of service were not filed in this Court. These documents, however, were unnecessary under 28 U.S.C. § 1446(a), which only requires the filing of "process, pleadings, and orders served upon defendant."

have responded with a cross-motion for summary judgment (Paper 87).[3]  The cross-motion is unopposed.[4]

A.    Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried, and that the undisputed material facts warrant judgment for the moving party as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006); Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112, 116 (2d Cir. 2006).  The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Once a properly

---

[3]    The City Defendants' motion for summary judgment was not accompanied by a notice to *pro se* litigant opposing motion for summary judgment.  Given that Pietrangelo is an attorney, has significant litigation experience in this Court, including experience with complex summary judgment filings (see Pietrangelo v. AMI Burlington, Inc., File No. 2:05-CV-124), and clearly understood the need to respond to the Alvas Defendants' motion for summary judgment, the Court finds that this omission was harmless.  See Schafler v. Summer, 63 Fed. Appx. 581, 584 (2d Cir. 2003) (not reported).

[4]   Although Pietrangelo has not responded directly to the City Defendants' motion, and has not refuted their statement of undisputed material facts as required by L.R. 7.1(c), he has submitted an affidavit in response to the Alvas Defendants' motion that has some bearing on the City Defendants.  (Paper 45). The Court will consider the statements in this affidavit when determining which facts are truly undisputed.

supported motion for summary judgment has been made, the burden shifts to the non-moving party to make a sufficient showing to establish the essential elements of that party's case on which it bears the burden of proof at trial.  Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003).  Under this Court's Local Rules, all material facts that are set forth in the movant's statement of undisputed facts are deemed to be admitted unless controverted by the non-movant's statement of disputed facts. L.R. 7.1(c)(1)-(3).

The non-moving party must put forth "specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).  Nevertheless, a party opposing a motion for summary judgment cannot rely on mere speculation or conjecture.  See, e.g., Conroy v. N.Y. State Dep't of Corr. Servs., 333 F.3d 88, 94 (2d Cir. 2003).  Moreover, "proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment."  See Viscusi v. Procter & Gamble, 2007 WL 2071546, at *9 (E.D.N.Y. July 16, 2007).

Finally, the fact that the defendants' cross-motion for summary judgment is unopposed does not relieve the Court of its "duty to decide whether the movant is entitled to judgment as a matter of law." Vermont Teddy Bear Co. v. Beargram Co., 373 F.3d 241, 242 (2d Cir. 2004). A plaintiff's failure to oppose summary judgment allows the Court to accept the defendants' factual assertions as true; however, the Court "must be satisfied that the citation to evidence in the record supports the assertion." Id.

B. Failure To Protect

Among Pietrangelo's many claims is the allegation that the City Defendants failed to protect him while he was exercising his First Amendment rights. Although alleged in the context of free speech, the claim raises a substantive due process question. See DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 197 (1989). The Supreme Court has held that, in general, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. Stated somewhat differently, "in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973); see also Nieves v. Gonzalez, 2006 WL 758615, at *4 (W.D.N.Y. Mar. 2, 2006) ("[C]ourts within the Second Circuit have determined

19

that '[t]here is . . . no constitutional right to an investigation by government officials.'") (citations omitted).

Pietrangelo nonetheless claims that the police violated his rights when they failed to detain, investigate, and/or prosecute John Doe. He also argues that the police should have stayed to protect him after his encounter with Doe. Indeed, he asks the Court to issue an order requiring such protection, claiming that without it he fears for his safety and, consequently, is unable to exercise his free speech rights.

What Pietrangelo's claims ignore is the "deep-rooted" matter of police discretion. Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 761 (2005). As the Supreme Court proclaimed in Chicago v. Morales, 527 U.S. 41, 62 n.32 (1999), it is "common sense that all police officers must use some discretion in deciding when and where to" enforce the law. To require the Burlington Police Department to escort Pietrangelo whenever he chooses to picket would deny the police any discretion as to how to best utilize their officers in the field. Moreover, it is plain that Pietrangelo has no liberty interest in a constant police presence. See Gonzales, 545 U.S. at 755.

Pietrangelo also focuses upon Officer Labrecque's conduct when Labrecque first appeared at the scene. The complaint alleges that Labrecque failed to protect the plaintiff after Evan Alvanos's statement "to the effect: 'Best you leave'" constituted

a "veiled threat." (Paper 5 at 7). Pietrangelo claims that the threat was made in Officer Labrecque's presence, that Labrecque overheard the threat, and that he specifically informed Labrecque of the threat.

In support of the City Defendants' summary judgment motion, Officer Lebrecque has submitted an affidavit in which he attests that "[t]he owners [of the deli] did not say anything threatening about Plaintiff when I was talking to them, and I did not think the owners – or any other specific individual – presented any danger to Plaintiff . . . . In sum, I . . . did not believe the owners had any intention of trying the stop Plaintiff from protesting." (Paper 88-3 at 2). Labrecque's affidavit does not address the allegation that Pietrangelo informed him of Evan Alvanos's statement.

Although under <u>DeShaney</u> a citizen has no general right to police protection, there is an exception where an officer "affirmatively created or enhanced the danger of private violence." <u>Okin v. Vill. of Cornwall-On-Hudson Police Dep't</u>, 2009 WL 2500197, at *9 (2d Cir. Aug. 18, 2009) (citing <u>Dwares v. City of New York</u>, 985 F.2d 94, 99 (2d Cir. 1993), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 164 (1993)). In <u>Okin</u>, the Second Circuit noted that this exception, known as the "state-created danger doctrine," may be invoked in instances of

affirmative conduct by the police, as well as when "repeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances'" that certain conduct would go unpunished.  Id. at *9-*10 (citing Dwares, 985 F.2d at 99; Hemphill v. Schott, 141 F.3d 412, 418-19 (2d Cir. 1998); Pena v. DePrisco, 432 F.3d 98, 111 (2d Cir. 2005)).

This case is clearly distinguishable from those in which the Second Circuit has found a "state created danger."  Id. at *9. In Dwares, the police officers allegedly indicated to skinheads that they could assault demonstrators, promising not to interfere or make arrests unless the skinheads "got completely out of control."  985 F.2d at 97.  In Hemphill, the police allowed a store manager who had been robbed to join them in pursuit of the suspect after returning the manager his gun, which he then used to shoot the suspect.  141 F.3d at 418-19.  And in Okin, the evidence at summary judgment indicated repeated assurances by police that an assailant's continued violence would go unpunished.  2009 WL 2500197, at *11.  In each instance, the conduct by the police made it more likely that violence would occur.

Here, there were no assurances, either direct or indirect, by Officer Labrecque.  Viewing the facts in a light most favorable to Pietrangelo, a statement was made that could

22

arguably be construed as a threat.  The statement was made while
Labrecque was in the vicinity, and the plaintiff alerted him to
the statement.  Nonetheless, having spoken with the deli owners,
Labrecque did not perceive a threat and left the scene.  To the
extent that Pietrangelo was ever in any sort of danger, Officer
Labrecque's departure did not create or enhance that danger.

Furthermore, in order to establish a substantive due process
violation, Pietrangelo must show that Labrecque's conduct was "so
egregious, so outrageous that it may fairly be said to shock the
contemporary conscience."  Id. at *2 (citing County of Sacramento
v. Lewis, 523 U.S. 833, 847 n.8 (1998)).  In Okin, the Court
found that the officers' conduct, which included discussing
football with the assailant while his victim complained of
beatings and choking, showed a "willful disregard of the obvious
risks of a domestic violence situation."  Id. at *3.  Again,
there was no such conduct here.  Officer Labrecque arrived at the
scene, spoke with the relevant parties, and left.  While he may
have been aware of Evan Alvanos's statement to Pietrangelo, his
decision to leave the scene rather than provide Pietrangelo with
constant police protection does not "shock the contemporary
conscience."  Pietrangelo's failure to protect claim is therefore
DISMISSED.

C.  First Amendment Claim

Pietrangelo further alleges that by restricting him to the grassy strip next to the sidewalk, the City Defendants inhibited his ability to express himself.  In response to this claim, Lieutenant Helrich's undisputed affidavit explains that the plaintiff was holding a three foot by three foot sign on a sidewalk that was approximately four feet wide.  (Paper 88-4 at 3).  Next to the sidewalk was "a swath of grass that we refer to as the 'greenbelt'" which was also approximately four feet wide. Id.  In Helrich's opinion, "while Plaintiff picketed on the pavement with a three-foot-wide sign, he necessarily obstructed other people who attempted to use the sidewalk . . . ."  Id. at 3-4.

As noted above, Helrich does not remember ordering Pietrangelo off the sidewalk, but does recall suggesting that he protest on the greenbelt to avoid blocking the sidewalk.  Id. at 4.

> I do not believe I told Plaintiff to stay off the sidewalk, but rather, said he could not obstruct others on the sidewalk while protesting.  I understand Plaintiff had a right to protest, and also understand that pedestrians and drivers had a right to use the sidewalk/driveway without being obstructed by Plaintiff.  I believe that if Plaintiff used the grass next to the narrow sidewalk to protest and hold his three-foot sign, all objectives could be accomplished.

Id.  Helrich further believed that "Plaintiff could reach exactly the same audience and deliver exactly the same message,

regardless of whether he stood on the grass or cement while protesting outside the deli." Id.

Accordingly, the City Defendants argue that Pietrangelo's speech was not impeded, and that at most he was restricted as to the "time, place or manner" of his expression. (Paper 87 at 19) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). Such restrictions are permissible so long as they (1) are justified without reference to the content of the regulated speech,(2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for the communication of the information. Ward, 491 U.S. at 791.

Here, there was no regulation of the content of Pietrangelo's speech. Instead, he was asked to use the "greenbelt" so that he did not block the four-foot-wide sidewalk with his body, sign and videocamera. The governmental interest at issue was the unobstructed use of the sidewalk by pedestrians. Courts have held that keeping such places free of congestion for other passers-by is a legitimate government policy. See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S 640, 650 (1981) ("As a general matter . . . a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."); Bery v. City of New York, 97 F.3d 689, 697 (2d Cir. 1996) ("The City certainly has a

25

significant interest in keeping its public places safe and free of congestion.").

Lieutenant Helrich's suggestion that Pietrangelo step onto the grass was narrowly tailored to serve this legitimate governmental interest. <u>See</u>, <u>e.g.</u>, <u>Marcavage v. City of Chicago</u>, 2009 WL 2143769, at *7 (N.D. Ill. July 20, 2009) (order requiring protestors to step onto grass next to sidewalk still allowed them "to preach, hold signs, engage in conversations and pass out literature"). Furthermore, the greenbelt was an adequate alternative location, being directly adjacent to the sidewalk and equally wide. The Court therefore finds, even assuming that Pietrangelo was directed by the police to restrict his picketing to the grassy strip next to the sidewalk, that Pietrangelo's First Amendment rights were not violated by this restriction.[5]

D.  <u>Questioning By Lieutenant Helrich</u>

Pietrangelo further claims that when Lieutenant Helrich approached him and asked him questions, subsequent to Pietrangelo's own 911 call, Helrich's questioning constituted an illegal seizure in violation of the Fourth Amendment. Specifically, Pietrangelo asserts that Helrich ordered him to "stand in place with him on a small strip of curb lawn along Pine

---

[5] To the extent that Pietrangelo claims his rights were violated because he was afraid to return to the deli area, this allegation falls within the analysis of his failure to protect claim.

Street and answer his questions . . . . Plaintiff did not consent to this order and requirement but complied with it because he felt he had no choice otherwise."  (Paper 5 at 10).

"A seizure occurs only where a law enforcement official, by means of physical force or show of authority, has restrained the liberty of a citizen."  Harris v. Wydra, 531 F. Supp. 2d 233, 242 (D. Conn. 2007) (citing Florida v. Bostick, 501 U.S. 429, 434 (1991)).  Police may generally ask questions, ask to examine an individual's identification, and request consent to search his or her property without having conducted a seizure.  Id. (citing Muehler v. Mena, 544 U.S. 93, 101 (2005)).  "The fact that most individuals will respond to police questioning without being told that they are free to leave does not eliminate the consensual nature of the interaction."  Id. at 242-43 (citing I.N.S. v. Delgado, 466 U.S. 210, 216 (1984)).

A person is "seized" within the meaning of the Fourth Amendment only if, in view of all of the surrounding circumstances, a reasonable person would have believed that he was not free to leave.  United States v. Mendenhall, 446 U.S. 544, 554 (1980).  The Supreme Court has enumerated several non-exclusive factors indicative of a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or

the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id.

Here, even if the Court accepts the facts in the complaint, there is no indication of a Fourth Amendment seizure. At least initially, Lieutenant Helrich was the only officer at the scene. He questioned Pietrangelo not as a suspect, but as a person who had called the police himself. There is no allegation that Helrich used or threatened any sort of force, displayed his weapon, or touched Pietrangelo. Pietrangelo's statement that he complied with Helrich's instructions and did not feel free to leave does not, by itself, raise the interaction to the level of a Fourth Amendment seizure. Harris, 531 F. Supp. 2d at 242-43. Based upon the totality of circumstances surrounding Pietrangelo's questioning, no reasonable juror could find that Helrich's conduct violated the Fourth Amendment. Pietrangelo's "unlawful seizure of person and interrogation" claim is therefore DISMISSED. (Paper 5 at 19).

E. Conspiracy

Several of Pietrangelo's legal claims center on his interactions with John Doe outside the deli. With regard to the City Defendants, the complaint speculates that they conspired with Doe and the Alvas Defendants to violate Pietrangelo's constitutional rights. Specifically, Pietrangelo claims that all defendants "agreed and conspired to violate Plaintiff's rights

and to unlawfully cause Plaintiff injury as described [elsewhere in the complaint], and in furtherance of their agreement/conspiracy did commit said violation/injury, to retaliate against Plaintiff for his picketing and to intimidate Plaintiff into stopping his picketing." (Paper 5 at 20).

To prove a conspiracy claim under § 1983, Pietrangelo must show "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). In the absence of additional evidence, a conspiracy claim must provide more than "[a] merely conclusory allegation that a private entity acted in concert with a state actor . . . ." Ciambrello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).

Pietrangelo's only factual allegation that might, under an extremely liberal reading, suggest a conspiracy is his claim that the police "appeared solicitous and sympathetic to the Alvanoses." (Paper 5 at 6). Pietrangelo might also cite the entire course of events, including the fact that the police released John Doe and issued the plaintiff a no trespass order, as evidence of a conspiracy. Even viewing the undisputed facts in a light most favorably to the plaintiff, however, these facts are insufficient to support a conspiracy claim.

Furthermore, Lieutenant Helrich's affidavit explains that he did not know John Doe prior to arriving at the scene. (Paper 88-4 at 2). Nor did he encourage Doe to harass or otherwise interfere with Pietrangelo. In fact, he advised Doe to leave Pietrangelo alone. Id. Similarly, Officer Labrecque attests that he did not know John Doe, "did not have any conversations with John Doe before he apparently approached Plaintiff, did not ask 'John Doe' to confront Plaintiff, and was never aware John Doe – or anyone else – planned to confront Plaintiff while he protested." (Paper 88-3 at 2).

In sum, nothing in the record evidences any sort of conspiracy to cause Pietrangelo constitutional injury. With regard to the actions taken by the police while at the scene, for reasons discussed above, there was no unconstitutional conduct whatsoever. The police arrived, caused John Doe to leave, had no duty to investigate or prosecute, and advised Pietrangelo that he was not to step onto deli property.

In the course of conducting their duties, the police spoke with both the plaintiff and the Alvanoses. While Pietrangelo may have suspected or perceived that the police were more solicitous and sympathetic to the deli ownership, his suspicions are insufficient to maintain a conspiracy claim. The allegation of a conspiracy on the part of the City Defendants is therefore DISMISSED.

F.    <u>Equal Protection</u>

Pietrangelo briefly alleges selective enforcement and retaliation in violation of the Equal Protection Clause.  The defendants submit that these claims are entirely unsupported.

An equal protection claim requires two elements: (1) that the plaintiff was treated differently than others similarly situated, and (2) that this differential treatment was motivated by an intent to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.  <u>Freedom Holdings, Inc. v. Spitzer</u>, 357 F.3d 205, 234 (2d Cir. 2004); <u>Diesel v. Town of Lewisboro</u>, 232 F.3d 92, 103 (2d Cir. 2000).  A plaintiff need not necessarily show that he is a member of a particular protected group, so long as he alleges that he has been "treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  <u>Vill. of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000).

Pietrangelo has not set forth any facts about "others similarly situated."  Nor has he alleged facts sufficient to state a claim of discriminatory intent.  While he does allege that the City Defendants' actions were intended, in part, as retaliation for his previous litigation against the South Burlington Police Department, there is no allegation that the

police even knew of Pietrangelo of his prior litigation before their encounter with him at the deli.  In sum, Pietrangelo's complaint offers no support for a claim that his treatment was "unequal" in any constitutionally cognizable sense of the word. This claim for relief is therefore DISMISSED.

    G.   <u>Qualified Immunity</u>

    The defendants also argue that they are entitled to qualified immunity for their actions.  Qualified immunity shields government officials, including law enforcement officers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>McEvoy v. Spencer</u>, 124 F.3d 92, 97 (2d. Cir. 1997) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).

    Granting qualified immunity involves a two-part inquiry. First, the Court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right."  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 821 (2009).  If the plaintiff's constitutional rights were not violated then the issue of qualified immunity need not be further addressed, since "where there is no viable constitutional claim, defendants have

no need of an immunity shield." <u>Walyck v. Rio</u>, 496 F.3d 139, 154 (2d Cir. 2007) (internal citations omitted).

Assuming a constitutional violation, the next question is "whether the right was clearly established . . . in light of the specific context of the case." <u>Id.</u> A right is "clearly established" when ignorance of its existence would be unreasonable. Thus, if all that a rational jury could decide is that "reasonable officers would disagree about the legality of the defendants' conduct under the circumstances, then qualified immunity applies and summary judgment for the officers is appropriate." <u>Lennon v. Miller</u>, 66 F.3d 416, 421 (2d Cir. 1995).

In <u>Pearson v. Callahan</u>, the Supreme Court recently held that district courts are not obligated to follow the analytical protocol set forth in <u>Saucier</u>, and have the discretion to evaluate claims of qualified immunity by deciding only whether a particular right was "clearly established." <u>Pearson</u>, 129 S. Ct. at 816. In other words, courts need not necessarily decide first whether a constitutional violation occurred, especially when that query is complex, if it is obvious that reasonable officials could disagree about the legality of the challenged conduct. <u>Id.</u> at 818; <u>Finigan v. Marshall</u>, 574 F.3d 57, 61 n.3 (2d Cir. 2009).

In this case, the Court finds that no constitutional violations occurred, and that the defendants do not need the shield of qualified immunity to protect them from liability.

Principles underlying qualified immunity, however, provide additional support for dismissal at this stage in the case. Indeed, "the driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." Pearson, 129 S. Ct. at 815.

Even if the Court were to find constitutional violations, the conduct by the police did not violate clearly established rights. Pietrangelo had no clearly established right to constant police protection, or to protest from the sidewalk as opposed to the grass next to it. He had no clearly established right to have John Doe investigated or arrested, or to be free from non-custodial questioning. His conspiracy claims are controverted by sworn affidavits, and he has provided no rebuttal. Accordingly, and in keeping with qualified immunity's long-established goal of saving government officials from needless litigation, the Court finds that defendants Helrich and Labrecque are entitled to summary judgment on all constitutional claims.

H.    State Law Claims

The state law tort and conspiracy claims against Helrich and Labrecque are also ripe for dismissal. These claims, which include allegations of assault, battery and false imprisonment as well as intentional infliction of emotional distress, rely on there having been a conspiratorial relationship between the

police and John Doe.  As discussed above, it is plain that no such relationship existed, and that the police cannot be held liable for Doe's alleged conduct.

    I.   <u>City of Burlington</u>

In addition to the two police officers, Pietrangelo has named the City of Burlington as a defendant.  Because the Court has found that the officers did not violate Pietrangelo's constitutional rights, it necessarily follows that they did not act pursuant to a City policy or custom that would subject the City itself to liability.  See <u>Matican v. City of New York</u>, 524 F.3d 151, 154 (2d Cir. 2008).

Furthermore, even if the officers had committed some form of constitutional violation, Pietrangelo has failed to show any sort of municipal policy that resulted in such conduct.  In <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 691 (1978), the Supreme Court held that a municipality cannot be held liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort . . . .  [I]n other words, a municipality cannot beheld liable under § 1983 on a *respondeat superior* theory."  Pietrangelo is clearly aware of the <u>Monell</u> standard, as his sixteenth and seventeenth causes of action allege that the "City of Burlington, through its Police Department, had/has a policy, practice, custom or usage of violating" individuals' constitutional rights.  (Paper 5 at 21).

Further, and again echoing Monell, Pietrangelo asserts that this "policy, practice, custom, or usage was the driving force behind the violations of Plaintiff's rights . . . ." Monell, 436 U.S. at 694 (municipal action must be "moving force" behind deprivation of federal rights).

Notwithstanding his legally precise pleadings, Pietrangelo has failed to respond to the City Defendants' summary judgment motion with any evidence of a municipal policy that is the "driving force" behind constitutional violations. To the extent that Pietrangelo might request discovery on the issue, no discovery is warranted because, for reasons set forth above, there were no such violations. See Amato v. City of Saratoga Springs, 170 F.3d 311, 320 (2d Cir. 1999) (holding that personal liability under § 1983 must be established before considering whether claim lies against municipal employer). All federal constitutional claims against the City of Burlington are, therefore, DISMISSED.[6]

---

[6] Pietrangelo also brings claims under the Vermont Constitution. As the Vermont Supreme Court explained in Pietrangelo v. AMI-Burlington, Inc., 2008 WL 3976503, at *2 (Vt. August Term 2008), "the Vermont Constitution may afford greater protection to individual rights than do the provisions of the federal charter. It is, however, a litigant's burden to demonstrate why the Vermont Constitution is more restrictive than the United States Constitution." (Citations and internal quotations omitted). Having failed to oppose the City Defendants' summary judgment motion, Pietrangelo has not met his burden. Accordingly, the state constitutional claims are also DISMISSED.

III. Alvas Defendants' Motion for Summary Judgment

The Alvas Defendants have moved for summary judgment as well, essentially claiming that they had no affiliation with John Doe and, therefore, cannot be held liable for any of Doe's alleged actions. Unlike the City Defendants' summary judgment motion, the Alvas Defendants' motion is opposed. Pietrangelo has also cross-moved for summary judgment.

Before the Court reaches the merits of these motions, it must resolve two preliminary matters. First, both parties assert that the motion filed by the other should not be heard because the Alvas Defendants had not yet been served with process when the motions were filed. Neither party has shown that the Court lacks jurisdiction to hear the motions. Instead, the cases cited by the parties suggest that the motions are merely premature. See, e.g., Taylor v. Wells Fargo Bank, 2008 WL 510192, at *1 (D. Neb. Feb. 22, 2008). While this may be true, the Court finds no jurisdictional bar, particularly in light of the fact that all defendants have now been served.

Second, Pietrangelo bases his summary judgment motion in large part upon the assumption that the Alvas Defendants have accepted all of the allegations in his complaint as true. This assumption arises out of two footnotes in the Alvas Defendants' summary judgment motion, in which they cite to a paragraph in the complaint and explain that they "assume the truth of this (and

all other allegations) only for the limited purposes of this *Motion for Summary Judgment*." (Paper 34 at 2-3, n.1 and 2) (parentheses in original). Pietrangelo has seized upon the "and all other allegations" language in the parenthetical and filed a statement of undisputed facts on the basis of the two footnotes. (Paper 41-2).

What Pietrangelo's assumption overlooks is the Alvas Defendants' language limiting their use of facts in the complaint to their own motion. Although perhaps inartfully drafted, the footnotes in the summary judgment motion plainly reserve the right to dispute Pietrangelo's facts in all other contexts. Accordingly, Pietrangelo's reliance on the footnotes as an acceptance of his entire complaint is misplaced, and as a consequence, his motion for summary judgment is largely unsupported by admissible evidence.

With regard to the substance of the Alvas Defendants' summary judgment motion, the motion is based almost entirely upon their efforts to distance themselves from John Doe. They also argue that they did not contribute to any constitutional violations. (Paper 34). In support of their motion, they have submitted affidavits from George, Christine and Evan Alvanos, each of whom testify that John Doe was not a deli employee, was not acting at their direction, and that they do not know his identity. (Papers 34-3, 34-4 and 34-5).

Pietrangelo's opposition to the motion argues that he is
entitled to discovery on the question of whether the Alvanoses
are being truthful.  He has also submitted his own affidavit in
which he states that, prior to his encounter with John Doe, he
saw Doe "talking to one of the Defendant Alvanoses in a manner
indicating they were friends and/or in a working relationship."
(Paper 45 at 5).  Finally, Pietrangelo has submitted a Rule 56(f)
affidavit in which he outlines the discovery he would undertake
in an effort to prove the Alvas Defendants' involvement in John
Doe's actions.  (Paper 51).

"Fed. R. Civ. P. 56(f) provides, as interpreted by court
opinions, that when a party facing an adversary's motion for
summary judgment reasonably advises the court that it needs
discovery to be able to present facts needed to defend the
motion, the court should defer decision of the motion until the
party has had the opportunity to take discovery and rebut the
motion."  <u>Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys.,
Inc.</u>, 271 F.3d 374, 386 (2d Cir. 2001); <u>see also</u> <u>Miller v.
Wolpoff & Abramson, L.L.P.</u>, 321 F.3d 292, 301-07 (2d Cir. 2003)
(holding that grant of defendants' summary judgment motion was
"premature" where district court denied Rule 56(f) relief and did
not afford plaintiff "any opportunity" to conduct discovery to
oppose defendants' motion); <u>Trebor Sportswear Co. v. The Ltd.
Stores, Inc.</u>, 865 F.2d 506, 511 (2d Cir. 1989) ("Under Rule

56(f), summary judgment may be inappropriate where the party opposing it shows . . . that he cannot at the time present facts essential to justify his opposition.  The nonmoving party should not be 'railroaded' into his offer of proof in opposition to summary judgment.  The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment.") (internal quotations and citations omitted).

There is no indication in the docket of any discovery activity by the parties.  This may be due, in large part, to the fact that dispositive motions are pending.  The standard for allowing additional discovery is particularly lenient where discovery has not yet commenced.  See Reed v. Staniero, 2007 WL 3430935, at *7 (D.N.J. Nov. 13, 2007) (gathering cases recognizing the distinction between a request for additional discovery and the request to commence discovery and applying more lenient standard in the latter situation); see also Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 301-07 (2d Cir. 2003) (decision on motion for summary judgment should be deferred until after parties have conducted discovery).

Pietrangelo's affidavit suggests that the Alvanoses may have known and/or spoken with John Doe prior to Doe's encounter with him.  The Alvanoses have submitted sworn affidavits denying that they ever directed, instructed, or encouraged Doe to act as he

did.  The Court makes no judgment at this time as to the veracity of any of the parties' affidavits, as credibility determinations at the summary judgment stage are generally inappropriate.  <u>See Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 122 (2d Cir. 2004) (noting that at summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments").

The evidence presented by the plaintiff, minimal though it may be, indicates that he is entitled to engage in discovery before being required to challenge the Alvas Defendants' summary judgment motion.  The Court therefore declines to grant summary judgment to the Alvas Defendants on any claims in which their liability is based upon a connection to John Doe and his alleged conduct.

The Alvas Defendants also move for summary judgment on Pietrangelo's constitutional claims.  In order for private defendants to be held liable under § 1983, they need to have violated the Constitution in willful collaboration with state actors.  <u>Dwares</u>, 985 F.2d at 98.  Here, the Court has found that the state actors did not engage in unconstitutional conduct. Consequently, the Alvas Defendants cannot have violated the Constitution, all constitutional claims against them are

DISMISSED, and any discovery with regard to these defendants shall be limited to Pietrangelo's state law claims of assault, battery, false imprisonment, intentional infliction of emotional distress and common law conspiracy.

IV.  Sole Remaining Federal Claim

As a result of this Opinion and Order, the only remaining federal claim is the constitutional challenge to the trespass statute brought against Attorney General Sorrell.  The Attorney General's motion to dismiss this claim was previously denied by the state court.  (Papers 21 and 32).  Because the Court views Pietrangelo's challenge as presenting a primarily legal issue, a schedule for summary judgment filings is set forth below.

V.  Motion For Costs Of Effecting Service

Pietrangelo has moved the Court to award him costs he incurred while effecting service on seven of the nine defendants. Those defendants concede that Pietrangelo is entitled to costs for postage, copying and Sheriff's fees, but oppose reimbursement for car rentals, gasoline, hotels  and a private courier.  These latter expenses were primarily incurred when Pietrangelo deemed it necessary to travel twice from Ohio to Vermont in an effort to obtain service materials and deliver them to the Sheriff.

Service in this case was executed before the case was removed, and was therefore governed by Vermont law.  Under Vermont Rule of Civil Procedure 4(l)(3)(G), a defendant who does

not comply with a request for waiver of service is responsible for "the costs subsequently incurred in effecting service" unless good cause is shown. The four Alvas Defendants and three City Defendants each declined to waive service, and there is no dispute that they are liable for a portion Pietrangelo's costs. Specifically, the defendants have agreed to pay Pietrangelo's costs related to filing motions for extension of time in which to serve, costs for copying the complaint, the cost of express mailing completed summonses to the state court, and the Sheriff's fees. These costs amount to approximately $475.

The amount in dispute totals over $1,800. Most of these costs are travel-related. On December 18, 2008, Pietrangelo was granted an enlargement of time to January 21, 2009 in which to serve the defendants. He claims that, due to "family and other commitments," he was unable to turn his attention to service until January 14, 2009, at which point he felt he needed to travel to Vermont from Ohio to personally ensure that summonses were obtained and served in a timely manner.

When he arrived in Vermont, however, Pietrangelo was unable to obtain signed summonses because he would not provide a permanent address. He was thus compelled to file another motion for extension of time, and was allowed until March 25, 2009 in which to effect service. In February 2009, he again traveled to Vermont, and in this trip was able to deliver completed summonses

to the Sheriff for service.  Pietrangelo's first trip, in which
he reportedly drove through bad weather, cost him over $1,000.
His second trip cost $795.67.

It is not clear to the Court why these trips were necessary,
and even if they were, why the defendants should bear the costs.
Pietrangelo claims that he came to Vermont in January because he
had only one week in which to obtain summonses and deliver
materials to the Sheriff.  However, his motion for extension of
time was granted in mid-December.  While he contends that family
and other commitments prevented him from dealing with service,
the Court is not persuaded that Pietrangelo's life circumstances,
and his alleged inability to communicate with the state court
either by phone or mail in late December and early January,
should cost the defendants over $1,000.

Similarly, it appears that the second trip to Vermont could
have been avoided.  Pietrangelo claims in his motion that he
personally attended to these matters, and felt the need to
deliver things by hand because he (1) anticipated a lack of
cooperation by the Sheriff's Department and (2) did not trust the
mail service.  It is not clear that either of these concerns were
justified, or that the defendants should be compelled to
reimburse Pietrangelo for his cautious approach.  Similarly,
having the returns hand-delivered from the Sheriff to the court

at a cost of $44.90, presumably because mail was unreliable, was not necessary.

The Court therefore finds that the Alvas Defendants owe the plaintiff service costs of $266.25, and the City Defendants owe service costs of $209.07. Payment shall be sent within 30 days of this Opinion and Order.

## Conclusion

For the reasons set forth above, it hereby ORDERED that:

(1) Pietrangelo's motion to remand (Paper 73) is DENIED.

(2) Pietrangelo's motion for costs of effecting service (Paper 68) is GRANTED in part and DENIED in part. The Alvas Defendants owe the plaintiff service costs of $266.25, and the City Defendants owe service costs of $209.07. Payment shall be sent within 30 days of this Opinion and Order.

(3) The City Defendants' motion for summary judgment (Paper 87) is GRANTED, and all claims against defendants Emmet Helrich, Wade Labrecque and the City of Burlington are DISMISSED. Correspondingly, Pietrangelo's motions for summary judgment against Helrich and Labrecque (Papers 42 and 43) are DENIED.

(4) The City Defendants' motion to dismiss (Paper 76) is DENIED as moot.

(5) Pietrangelo's motion to strike in part the response to his summary judgment motion (Paper 52) is also DENIED as moot.

(6) Pietrangelo's motions for a preliminary injunction and a temporary restraining order (Papers 6 and 7), each of which seek relief against the City Defendants, are DENIED.

(7) The Alvas Defendants' motion for summary judgment (Paper 34) is GRANTED with respect to all constitutional claims, and is otherwise DENIED without prejudice.  Pietrangelo's motion for summary judgment as to the Alvas Defendants (Paper 41) is also DENIED without prejudice.

(8) Pietrangelo's motions (Papers 24 and 27) in response to previously filed motions to dismiss are DENIED as moot, as the state court denied the motions to dismiss.

(9) Any motion for summary judgment on Pietrangelo's statutory challenge (Counts 18 and 19) shall be filed on or before November 10, 2009.  Deadlines for opposition and reply memoranda shall be as set forth in L.R. 7.1.

(10) The remaining parties shall submit a proposed Discovery Schedule/Order pursuant to L.R. 26.1(b) on or before November 10, 2009.

Dated at Brattleboro, in the District of Vermont, this 7th day of October, 2009.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
Senior United States District Judge